IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JILL D. WILLIAMS, | ) | |
| | ) | CASE NO. 1:15CV891 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | KENNETH S. McHARGH |
| SECURITY ADMINISTRATION, | ) | |
| | ) | OPINION & ORDER |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to Local Rule 72.2(b). The issue before

the undersigned is whether the final decision of the Commissioner of Social Security

("Commissioner") denying Plaintiff Jill Williams' ("Plaintiff" or "Williams") application for a

Period of Disability and Disability Insurance benefits under Title II of the Social Security Act, 42

U.S.C. 416(i) and 423, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court VACATES the Commissioner's decision and

REMANDS the case back to the Social Security Administration.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for Disability Insurance benefits on June 18, 2012, alleging

disability due to diabetes, kidney disease, neuropathy, retinopathy, and heart disease, with an

alleged onset date of November 20, 2007. (Tr. 139). The Social Security Administration denied

Plaintiff's application on initial review and upon reconsideration. (Tr. 139-45, 147-53).

Plaintiff requested a hearing before an administrative law judge, and on November 20,

2013, an administrative hearing was convened before Administrative Law Judge Penny Loucas

("ALJ").  (Tr. 96-131). Plaintiff appeared, represented by counsel, and testified before the ALJ. (*Id.*).  A vocational expert ("VE"), Tom Nimburger, also appeared and testified.  (*Id.*).  On December 27, 2013, the ALJ issued a decision finding Plaintiff was not disabled.  (Tr. 85-91). After applying the five-step sequential analysis,[1] the ALJ determined Plaintiff retained the ability to perform work existing in significant numbers in the national economy through her date of last insured.  (*Id.*).  Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council.  (Tr. 78-80).  The Appeals Council denied her request for review, making the ALJ's December 27, 2013, determination the final decision of the Commissioner. (Tr. 1-3).  Plaintiff now seeks judicial review of the ALJ's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

  (1)  If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

  (2)  If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

  (3)  If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

  (4)  If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

  (5)  Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

## II.  EVIDENCE

### A.   Personal Background Information

Plaintiff was born on March 20, 1966, and was 41 years old on the alleged onset date, and 47 years old on the hearing date.  (Tr. 99, 139).  Plaintiff has an eleventh grade education and is able to read, write, and communicate in English.  (Tr. 99).  Plaintiff has past work experience as a photographer, money collector/vending machine operator, babysitter, and in telephone sales. (Tr. 104-08, 144).  Plaintiff is married and has children.  (Tr. 112-14).

### B.  Medical Evidence[2]

Dr. Waters

Plaintiff presented to Judith K. Waters, M.D., on November 19, 2007, complaining of terrible swelling in her lower extremities, extraordinary tiredness, and out of control blood sugar readings.  (Tr. 376).  Plaintiff reported generalized tiredness and lack of energy with presyncope (but no actualized syncope), but that she is fine with rest.  (*Id.*).  On physical examination, Dr. Waters noted nondistended abdomen, and no edema, cyanosis, or clubbing of her extremities, but minimal edema and swelling (but no tenderness) in her calves.  (*Id.*).  Neurological examination revealed generally normal findings, and Plaintiff exhibited symmetrical, 5/5 strength, as well as a straight and steady gait.  (*Id.*).  Dr. Waters' impression was generalized fatigue and weakness, edema, and diabetes mellitus 1, poorly controlled, and ordered laboratory testing, as well as an insulin increase.  (*Id.*).  Notes indicated Plaintiff "still works regularly."  (*Id.*).

An undated follow-up with Dr. Waters from November 19, 2007, noted previous markedly elevated liver enzymes that had since gone down, elevated BUN and creatinine which had since started to normalize, and minimal improvement in swelling with Lasix.  (Tr. 373).

---

[2] The following recital of Plaintiff's medical record is an overview of the medical evidence pertinent to Plaintiff's appeal.  It is not intended to reflect all of the medical evidence of record.

Further, Plaintiff informed Dr. Waters she is a type I diabetic, and has not been using her insulin properly for 18 years because it causes weight gain.  (*Id.*).  Dr. Waters described Plaintiff's comments that she enjoys losing weight while eating whatever she wants when not taking her prescribed insulin, that she feels tired, achy, and occasionally swollen, and that she is leaving another doctor due, in part, to differences of opinion.  (*Id.*).  Dr. Waters noted she and Plaintiff discussed depression and body image issues, and that Plaintiff reported she feels better if she eats more protein and less carbohydrates, but nonetheless eats whatever she wants, including "lots of junk and pastry."  (*Id.*).  Plaintiff again reported some near syncope symptoms, bloating, and swelling.  (*Id.*).  On examination, Dr. Waters again found normal neurological results, symmetrical 5/5 strength, and straight and steady gait, as well as very minimal pedal edema, and no calf tenderness or swelling.  (*Id.*).

Plaintiff underwent a kidney echo on December 6, 2007, on order from Dr. Waters.  (Tr. 396).  The report noted Plaintiff's history of new onset edema in her lower extremities.  (*Id.*).  From the results, Dr. Waters concluded Plaintiff had bilateral renal enlargement, as well as vascular calcifications of the right kidney with mild prominence, and requested Plaintiff contact her office for a follow-up appointment.  (*Id.*).

On January 16, 2008, Plaintiff underwent a biliary echo due to renal insufficiency, with elevated liver enzymes indicated.  (Tr. 395).  Findings suggested supersaturated bile with mild gallbladder distention, but no evidence for stones or obstruction.  (*Id.*).

On February 5, 2008, Plaintiff was again evaluated by Dr. Waters at a follow-up visit, after presenting at the ER with chest pain.  (Tr. 371).  A cardiac work-up was conducted, with negative findings, and Dr. Waters opined the pain was likely due to GERD, although she ordered a rule-out echocardiogram.  (*Id.*).  Plaintiff reported noncompliance with her insulin, although

she stated she was "using it more regularly now."  (*Id.*).  Physical examination revealed generally normal findings, including no edema and normal neurologic exam.  (*Id.*).

Dr. Waters ordered a rule-out echocardiogram due to Plaintiff's chest pain, performed on February 7, 2008, which concluded with a finding of negative stress echo.  (Tr. 302, 371).  During the test, Plaintiff exercised for five minutes before the test was terminated, secondary to Plaintiff's request and leg fatigue.  (Tr. 302).

Dr. Waters continued to treat Plaintiff for issues relating to her diabetes (as well as other complaints) from April 9, 2008 through August 3, 2009.  (Tr. 339-45 349-50, 353-56, 360-61, 364-65, 368).   Examination consistently showed normal neurological exam, no or minimal edema, no cyanosis or clubbing, normal deep tendon reflexes bilaterally, full and symmetrical strength, a straight and steady gait, and often denied weakness in her arms and legs.  (Tr. 339-45 349-50, 355-56, 360-61, 364-65, 368).   Dr. Waters had described her type I diabetes as "very labile," "very brittle," and "poorly controlled," and noted on multiple occasions that Plaintiff does not always take her insulin as directed, although she reported her sugars are good and she feels well when taking the insulin.  (Tr. 339, 349, 353-56, 360).

During visits in January and February of 2009, Plaintiff reported fatigue, stated she was not doing well and felt her diabetes was not under good control, and complained of no energy and swelling in her lower extremities and ankles. (Tr. 354-56, 361-62).  On January 26, 2009, Dr. Waters again observed normal neurological findings, strength, and gait, but noted Plaintiff's diabetes mellitus was getting out of control.  (Tr. 361-62). On February 3, 2009, Dr. Waters noted she strongly encouraged Plaintiff to see an endocrinologist for a second opinion.   (Tr. 356).   Treatment notes dated April 6, 2009, stated Plaintiff was diagnosed by Dr. Neki, an endocrinologist, with kidney disease, and that she would be getting an insulin pump to better

5

manage her diabetes, and that she was feeling fine.  (Tr. 344).  However, on May 6, 2009, Dr. Waters noted Plaintiff's diabetes mellitus and hypertension has been well controlled on Avapro, and would continue her on that medication.  (*Id.*).  Dr. Waters again noted Plaintiff's diabetes had been under good control on August 3, 2009, and her related renal insufficiency was "relatively well controlled."  (Tr. 339).  Dr. Waters further noted Plaintiff had some numbness in her lower extremities, "but she does have baseline neuropathy."  (*Id.*).

Plaintiff returned to Dr. Waters on July 15, 2010, for pain, injury and infection of her right foot after injuring herself with a water bottle.  (Tr. 297, 299).  Dr. Waters noted Plaintiff's history of type 1 diabetes mellitus and diabetic neuropathy, and diagnosed cellulitis of her second and third toes.  (Tr. 299).  Seven months later, on February 23, 2011, Dr. Waters' treatment notes indicated Plaintiff was miserable, tired, and suffered from body aches and "total body swelling," but that she had no hospitalizations or emergency room visits.  (Tr. 298).  Examination showed no edema of the extremities, no neurological localizing signs, but subjective tingling and decreased monofilament of the feet.  (*Id.*).  Dr. Waters noted her impression of poorly controlled diabetes, hypertension uncontrolled, and hyperlipidemia, noting considerable anasarca (edema/swelling), and a nephrology consultation for possible dialysis.  (*Id.*).

On July 7, 2011, Plaintiff presented to Dr. Waters with complaints of persistent edema, including her bilateral lower extremities, hands, and face.  (Tr. 293).  Examination showed trace edema in her bilateral lower extremities, and exam notes indicated Plaintiff's statements that the edema is "usually a lot worse."  (Tr. 294).  Examination notes dated December 12, 2011, showed Plaintiff presented with a chief complaint of fatigue, continuing for two to three months, accompanied by weight gain, swelling, muscle weakness, depression, and diarrhea, although not

requiring hospitalization or visits to the emergency room. (Tr. 292). Dr. Waters described Plaintiff as a "brittle diabetic," with a history of poorly controlled diabetes ("some of which is due to noncompliance"), hypertension, hypercholesterolemia, and borderline renal failure. (*Id.*). Dr. Waters noted Plaintiff works outside the home, but that she stated overwhelming fatigue makes it very difficult for her to function and interferes with her ability to work. (*Id.*). Examination showed no pretibial myxedema or neurological localizing signs, and Dr. Waters noted an impression of thyromegaly and fatigue. (*Id.*).

Plaintiff presented to Dr. Waters on April 16, 2012, complaining of nerve pain, swelling, and a history of renal issues. (Tr. 289). Dr. Waters described Plaintiff as a noncompliant diabetic complaining of severe disabling neuropathy that was "starting to interfere with her quality of life." (*Id.*). Notes indicated Plaintiff worked outside the home, that she was on a variety of medication and under the care of a endocrinologist and had been doing well on a strict insulin program. (*Id.*). Dr. Waters again noted Plaintiff was noncompliant with treatment for her diabetes on November 14, 2012, when Plaintiff complained of "feeling poorly," tired, and experiencing swelling. (Tr. 324). Notes at this time indicated Plaintiff was retired, and "unable to work secondary to fatigue." (*Id.*). Examination findings were generally negative with subjective numbness and tingling in her lower extremities, and Dr. Waters noted an impression of uncontrolled diabetes, fatigue, malaise, chest pain, multiple medical issues including diabetic neuropathy, and renal failure. (*Id.*). Dr. Waters ordered an immediate endocrinology consult, and stressed the importance of proper insulin usage, noting potential consequences of severe cardiovascular disease and death. (*Id.*).

Plaintiff returned to Dr. Waters with similar complaints on May 20, 2013, reporting numbness, tingling, and swelling in her feet, markedly elevated blood sugars, and terrible

problems with swelling, although examination showed minimal edema in her lower extremities. (Tr. 320).  An impression of probable diabetic neuropathy, diabetic retinopathy, and diabetic nephropathy was noted.  (*Id.*)

Specialists and Consultations

On March 20, 2008, Plaintiff attended a consultation with Haritha Boppana, M.D., on referral from Vladimir Dubchuk, M.D., for preoperative medical risk assessment for a laparoscopic cholecystectomy with cholanglogram and possible open cholecystectomy, scheduled for March 28, 2008.  (Tr. 459).  Treatment notes indicate a chief complaint of right upper quadrant pain for six months, on and off, as well as chronic diarrhea for three months. (*Id.*).  Her past medical history included type 1 diabetes mellitus insulin dependent, and diabetic retinopathy and neuropathy, and Plaintiff complained of nausea as well as a tingling sensation in the toes of both of her feet.  (*Id.*).  The report further noted a previous normal ultrasound, as well as hepatobiliary scan performed on February 13, 2008, showing delayed visualization of the gallbladder at two hours.  (*Id.*).  After physical examination, Dr. Dubchuk found Plaintiff exhibited chronic cholecystitis and symptomatic chronic cholelithlasis, observed her ultrasound was consistent with either supersaturated bile or with sludge, and opined gallstones could not be ruled out because of Plaintiff's history of elevated alkaline phosphatase.  (Tr. 460).

Kenneth E. Neki, M.D., an endocrinologist, examined Plaintiff on March 30, 2009, and assessed type I diabetes mellitus with poor glycemic control.  (Tr. 502).  Dr. Neki expressed that even with diligent efforts with insulin she would continue to have problems with high fasting blood sugars, and recommended an insulin pump.  (*Id.*).  A letter addressed to Dr. Waters indicated elevated liver tests, proteinuria, hematuria, and Dr. Neki prescribed Cymbalta for Plaintiff's neuropathic pain.  (*Id.*).  Dr. Neki opined that her complaints of edema and low

albumin levels could be due to early nephrotic syndrome.  (*Id.*).  Further, he expressed that Plaintiff complained of ultra-sensitivity in her feet, with shooting pains that come and go, and admitted she skips insulin in order to keep her weight down.  (Tr. 501).

Plaintiff returned to Dr. Neki on June 1, 2009, at which time he increased her Cymbalta due to complaints of continuing severe diabetic neuropathic foot pains.  (Tr. 454).  Plaintiff reported she believed her blood sugar levels were much better, although she experienced some late afternoon hypoglycemia.  (*Id.*).  1+ lower extremity edema was noted at a follow-up on February 8, 2010, likely due to nephrosis.  (Tr. 474).  On April 26, 2010, treatment notes indicated "trace to 1+" lower extremity edema, and Plaintiff complaints of swelling, not doing well, and that she was not taking care of herself.  (Tr. 473).

On April 30, 2012, Plaintiff underwent an evaluation at North Shore Gastroenterology due to abnormal liver function test and fluid around the liver consistent with mild ascites.  (Tr. 308).  Plaintiff reported swelling in her ankles, and examination showed no edema but chronic stasis changes, normal gait, and no neurological focal signs.  (Tr. 308-09).

Plaintiff was referred to neurologist Daniel Koontz, M.D., on August 6, 2012, for evaluation of her neuropathy symptoms.  (Tr. 467-68).  Dr. Koontz noted peripheral neuropathy, with symptoms starting five years prior, beginning with a crawling sensation in her lower legs, and developing into pain in her feet, as well as tingling and numbness in her hands.  (Tr. 467).  Plaintiff reported not much relief from Cymbalta, that Lyrica helped but she discontinued it when it caused weight gain, and that gabapentin helped but left her off-balance.  (*Id.*).  She described her pain as "stabbing," that any touching of her feet is painful and that she has difficulty putting on her shoes and applying lotion due to pain.  (*Id.*).  Examination revealed 5/5 strength in her upper and lower extremities, with markedly decreased vibration sensation at her

toes, and significantly decreased pinprick in her feet bilaterally.  (Tr. 468).  Plaintiff exhibited normal gait, and Dr. Koontz suggested an increase in gabapentin, noting he believed her imbalance was actually due to the decreased sensation in her feet that is accentuated when she closed her eyes.  (*Id.*).

On a form dated August 11, 2012, Fernando Zegarra, M.D., reported he treated Plaintiff from November 2, 2009 through July 30, 2012.  (Tr. 312).  Dr. Zegarra reported a diagnoses of proliferative diabetic retinopathy, and indicated a history of five laser surgeries and five avastin injections in Plaintiff's right eye, and four laser surgeries and three avastin injections in her left eye.  (Tr. 313).  Plaintiff was determined to have 20/40 vision in her right eye, and 20/25 vision in her left eye.  (*Id.*).

Plaintiff was referred by Dr. Waters for a functional capacity evaluation, performed on October 22, 2013, by Michelle Myers at Lifeworks of Southwest General Health Center.  (Tr. 506-07).  Ms. Meyers found Plaintiff was able to walk a total time of 32 minutes with occasional loss of balance, noting Plaintiff lost her balance twice during a five minute walk test, but regained her balance holding onto a railing.  (Tr. 507).  Plaintiff complained of weakness and fatigue in both her upper and lower extremities during functional activities, requested to stop above-shoulder work due to pain and fatigue in her upper extremities, and stated she had not been doing much exercise because of her neuropathy.  (*Id.*).  Ms. Meyers reported high scores in each category.  (Tr. 507).  Near full levels of physical effort by Plaintiff were noted, but Ms. Meyers found "minor inconsistency" to the reliability and accuracy of Plaintiff's reports of pain and disability, based on overall test findings and clinical observations.  (Tr. 506).

State Agency Reviewing Consultants

On September 4, 2012, state agency consultant Leslie Green, M.D., reviewed Plaintiff's file and the medical evidence of record, including the treatment notes of Dr. Waters and Dr. Zagarra.  (Tr. 140-41).  In her analysis, Dr. Green made specific reference to medical evidence dated up through December of 2011, and noted her history of renal failure and uncontrolled diabetes mellitus.  (Tr. 141).  Dr. Green opined Plaintiff was able to perform at a medium level of work, including standing or walking about six hours in an eight hour workday.  (Tr. 141-43).  Another state agency consultant, Diane Manos, M.D., affirmed these findings on December 27, 2012.  (Tr. 151).

**C.  <u>Hearing Testimony</u>**

Plaintiff testified that she was diagnosed as a brittle diabetic a few years prior to the hearing because her condition was getting harder to control, and that she gives herself insulin about five times per day, but it's "on a sliding scale."  (Tr. 101-02).  Plaintiff admitted she was not monitoring her blood glucose levels for a period of a month or two , claiming she became suicidal and "gave up," but that she currently monitored them.  (Tr. 115).  Plaintiff stated she had never been hospitalized due to uncontrolled blood sugar, and her doctor suggested she use an insulin pump, but that she could not deal with learning how to use it.  (*Id.*).  At the time of the hearing, Plaintiff testified she was back on Lyrica, which was helping her condition, but her biggest impediments to working were imbalance and pain.  (Tr. 103-04).  She further alleged she experiences fatigue, is often exhausted and tires very easily.  (Tr. 126-27).

She stated she had not worked since her job as a newborn photographer, which she decided to quit because she felt unsure carrying babies due to problems with her legs, and she struggled with bending and walking because of her neuropathy.  (Tr. 109-10).  She further articulated that her doctors never explained neuropathy to her until just recently, and that her

11

primary care physician told her the problems she had with her knees was because she was "getting older."  (Tr. 110-12).  Plaintiff testified she falls over when walking or standing, and that she recently started using a cane because her family forced her to, but that she can walk for exercise for about 20 minutes at a time, holding onto her husband or using her cane.  (Tr. 113, 123).  Additionally, Plaintiff indicated her knee problems caused her to have difficulty with steps, beginning about three years prior to the hearing, and that she experiences swelling in her legs every day, requiring elevation after a half-hour to an hour.  (Tr. 115, 119-20, 124).  Plaintiff described her pain as "shooting stabbing pain" that comes on suddenly, ruins her life and makes her unable to do anything, and stated she experiences it about half the day after starting Lyrica. (Tr. 117).

### III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on March 31, 2012.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of November 20, 2007 through her date last insured of March 31, 2012.

3. Through the date last insured, the claimant had the following severe impairment: diabetes mellitus.

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b).

6. Through the date last insured, the claimant was capable of performing past relevant work as a telemarketer, vending machine assistant, and photographer.  These jobs did not require the performance of work-related activities precluded by the claimant's residual functional capacity.

7.   The claimant was not under a disability, as defined in the Social Security Act, at any time from November 20, 2007, the alleged onset date, through March 31, 2012, the date last insured.

(Tr. 87-91) (internal citations omitted).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when he establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when he cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20 C.F.R. §§ 404.1505, 416.905.

## V.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion.  *See Mullen v. Bowen*, 800 F.2d 535,

545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). This Court may

not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See*

*Garner*, 745 F.2d at 387. However, it may examine all the evidence in the record in making its

decision, regardless of whether such evidence was cited in the Commissioner's final decision.

*See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI. ANALYSIS

### A. RFC - Credibility Analysis

Plaintiff argues that the ALJ improperly discredited Plaintiff's subjective complaints and

thus did not fully account for Plaintiff's limitations in her RFC. Generally, "[a]n ALJ's findings

based on the credibility of the applicant are to be accorded great weight and deference,

particularly since [the] ALJ is charged with the duty of observing a witness's demeanor and

credibility." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (*citing

Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). Notwithstanding, the ALJ's

credibility finding must be supported by substantial evidence, *Walters*, 127 F.3d at 531, as the

ALJ is "not free to make credibility determinations based solely upon an 'intangible or intuitive

notion about an individual's credibility.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th

Cir. 2007) (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

The Sixth Circuit follows a two-step process in the evaluation of a claimant's subjective

complaints of disabling pain. 20 C.F.R. §§ 404.1529, 416.929; *Felisky v. Bowen*, 35 F.3d 1027,

1039-40 (6th Cir. 1994). First, the ALJ must determine whether the claimant has an underlying

medically determinable impairment which could reasonably be expected to produce the

claimant's symptoms. *Rogers*, 486 F.3d at 247. Second, if such an impairment exists, then the

ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms on the

claimant's ability to work. *Id.* The ALJ should consider the following factors in evaluating the

claimant's symptoms: the claimant's daily activities; the location, duration, frequency and intensity of the claimant's symptoms; any precipitating or aggravating factors; the type, dosage, effectiveness and side effects of any medication taken to alleviate the symptoms; treatment, other than medication, the claimant receives to relieve the pain; measures used by the claimant to relieve the symptoms; and statements from the claimant and the claimant's treating and examining physicians. *Id.*; *see Felisky*, 35 F.3d at 1039-40; S.S.R. 96-7p.

In the present case, Plaintiff argues that the ALJ's credibility analysis is flawed because some of her stated reasons are either inappropriately considered to discredit the severity of her findings, or based on an inaccurate interpretation of the evidence.  First, Plaintiff takes issue with the ALJ's decision to discredit Plaintiff because her primary care physician, Dr. Waters, noted she was working outside the home in December 2011 and April 2012, despite Plaintiff's testimony that she has not worked since her newborn photography job, and there was no evidence of any earnings after 2007.  (Pl. Brief p. 12).  Second, Plaintiff challenges the ALJ's reference to Plaintiff's non-compliance with insulin because Plaintiff "admitted her non-compliance to Dr. Waters and stated that she would take her medication as prescribed," and because, despite medication, her diabetes was difficult to control.  (*Id.*).  Third, Plaintiff asserts the ALJ should not have discredited her because she testified she did not know what the term "brittle diabetic" meant, arguing it had no relation to her credibility.  (Pl. Brief p. 13).  Fourth, reasoning that diabetic neuropathy, fatigue, and edema are not conditions generally requiring hospitalization, Plaintiff asserts the ALJ's finding that she had never required hospitalization or emergency room treatment for her diabetes was not a proper reason to discredit her complaints. (*Id.*).  Finally, Plaintiff argues the ALJ inaccurately assessed Plaintiff's treatment notes relating to the severity of her edema, as well as to the onset of neuropathy-related nerve pain.  (*Id.*).

Although this Court does not accept every assignment of error articulated by Plaintiff in her credibility argument, the undersigned finds there are blatant misstatements in the ALJ's analysis that demonstrate her failure to accurately assess the evidence presented, undermining her credibility analysis.   *See generally* *Walters*, 127 F.3d at 531 (a court will "defer to the Commissioner's [credibility] assessment when it is supported by an adequate basis."); *see generally* *Hernandez v. Comm'r of Soc. Sec.*, No. 15-1875, 2016 WL 1055828, *7 (6th Cir. Mar. 17, 2016)* (An ALJ's credibility finding will not be disturbed where "nothing in the record contradicts [the ALJ's] observation," and his "determination is reasonable and reflects the substantial evidence in the record.").  First, the ALJ found as "strong and convincing evidence that…claimant's symptoms were not as disabling as alleged" because there was no record of "nerve pain" until April 16, 2012, at which time Dr. Waters found only subjective numbness, tingling, or decreased sensation on the bottom of her feet.  (Tr. 90).  However, as Plaintiff points out, review of the record show ongoing documentation of Plaintiff's complaints of, and ongoing treatment for, neuropathic pain, as far back as March of 2009.  (Tr. 454, 497, 501-02).  Indeed, treatment notes indicated her doctor continually increased or otherwise adjusted her medication to address her ongoing pain.  (Tr. 454, 497).

Plaintiff also sufficiently shows the ALJ, in justifying her discrediting of Plaintiff's complaints of persistent swelling, incorrectly stated examination notes of Dr. Waters and Dr. Koontz showed only "no edema" or "trace edema" of her lower extremities, while failing to acknowledge treatment notes reflecting more heightened levels of edema.  (Tr. 89).  It is generally recognized that an ALJ "may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding." *Smith v. Comm'r of Soc. Sec.*, 2013 WL 943874, *6 (N.D. Ohio Mar. 11, 2013) (*citing* *Goble v. Astrue*, 385 F. App'x 588,

593 (7th Cir. 2010)) (citation omitted); *see Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."). Notwithstanding, an "'ALJ does not "cherry pick" the evidence merely by resolving some inconsistencies unfavorably to a claimant's position.'" *Id.* Here, the ALJ cited to reports dated July and December 2011, as well as May and July of 2013, showing either no or trace edema of the lower extremities. (Tr. 292, 294, 320, 470). However, the ALJ did not reference Plaintiff's other treatment notes showing ongoing and persistent edema that was more than "trace," described as "minimal" or "mild," often of her feet and/or extremities. (Tr. 294, 356, 373). Although these records do not demonstrate that Plaintiff's doctors observed a tremendous increase in Plaintiff's edema over the course of treatment, it is not clear from her opinion that the ALJ fully considered these records of continuing edema that was, while mild, more severe and potentially more limiting than merely "trace" findings. *See Smith*, 2013 WL 943874, at *6; *see Orick v. Astrue*, No. 1:10-cv-871, 2012 WL 511324, at *5 (S.D. Ohio Feb. 15, 2012) ("When an ALJ fails to mention relevant evidence in his or her decision, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'") (*quoting Morris v. Sec. of Health & Human Servs.*, No. 86-5875, 1988 WL 34109, at *2 (6th Cir. Apr. 18, 1988)).

Further, the undersigned agrees that the ALJ erred when she gave less credit to Plaintiff because she "testified that she had never been told she is a brittle diabetic and that she does not know what that term means," despite Dr. Waters referring to Plaintiff as a "brittle diabetic" in her treatment notes dated December 6, 2011. (Tr. 89, 292). Plaintiff fails to provide any persuasive reason or case law in support of her assertion that this point, if accurate, could not be

appropriately considered to discredit her subjective complaints.  However, the undersigned nonetheless finds the ALJ's rationale undermines her analysis of the evidence, as review of the hearing testimony shows this statement is an undeniable misrepresentation of Plaintiff's testimony.  At the hearing, Plaintiff affirmed she was diagnosed as a brittle diabetic "a few years ago," and review of the hearing transcript does not reveal the statements on which the ALJ relied.[3]  (Tr. 102).  As this statement of the evidence is an error, it cannot provide support for the ALJ's credibility finding.  *See generally Simpson v. Comm'r of Soc. Sec.*, 344 Fed. App'x 181, 191 (6th Cir. 2009) (finding a lack of substantial evidence to support an ALJ's decision to discount a claimant's mental impairments because "the ALJ did not 'accurately state the evidence used to support his finding.'") (*citing White v. Comm'r of Soc. Sec.*, 312 Fed. App'x 779, 787-88 (6th Cir. 2009)).

Despite the ALJ's articulation of a scattering of other reasons for not giving full credit to Plaintiff's subjective complaints, the Court finds the substantial errors stated above demonstrate a failure on the part of the ALJ to fully consider the evidence of record and provide compelling reasons for her credibility determination.  This deficient evaluation of the evidence cannot provide substantial evidence in support of the ALJ's RFC assessment.  *See generally Simpson, 344 Fed. App'x at 191*.  Accordingly, remand is required for the ALJ to assess the evidence of record and formulate an RFC from which to make an ultimate finding of disability.  *See id. at 192* (Remanding a case is not a mere formality where failure to do so would "propel [our Court] into the domain which Congress has set aside exclusively for the administrative agency," namely "to determine the jobs available to [a claimant] based upon her limitations.").

**B.  Listing Analysis**

---

[3] The undersigned notes that, at the hearing, Plaintiff stated no one ever explained neuropathy to her, and that she "didn't know what neuropathy was," but that the ALJ makes no reference to this in her opinion. (Tr. 110-11).

Although remand is necessary based on Plaintiff's challenge to the ALJ's credibility analysis, for purposes of thoroughness, the undersigned will address Plaintiff's additional assertions of error.  Plaintiff claims the ALJ erred at step three of the sequential analysis by failing to consider whether her severe physical impairments met or medically equaled listing 9.00B, the listing for Endocrine Disorders, evaluated under 11.04B.  Specifically, Plaintiff argues that evidence in the record demonstrates that she satisfies the requirements of this listing, and the ALJ erred in failing to specifically analyze the listing and relevant medical evidence in denying her application.

The third step of the disability evaluation process asks the ALJ to compare the claimant's impairments with an enumerated list of medical conditions found in the Listing of Impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010).  Each listing describes "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. § 404.1525(c)(3).  A claimant will be deemed disabled if his impairments meet or equal one of these listings.  In order to "meet" a listing, the claimant must satisfy all of the listing's requirements.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009).  However, if the claimant does not meet all of the listing's requirements, he may still be deemed disabled if his impairments "medically equal" the listing in question.  20 C.F.R. § 404.1526(b)(3).  To do so, the claimant must show that his impairments are "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 404.1526(a).  At this step, it is the claimant's burden to provide evidence showing that she equals or meets the listing.  *Retka v. Comm'r of Soc. Sec.*, No. 94-2013, 1995 WL 697215, at *2 (6th Cir. Nov. 22, 1995) (*citing Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)).

Here, Plaintiff argues a proper analysis of the evidence would have led the ALJ to find her diabetes mellitus and related polyneuropathy met a listing.  Plaintiff asserts her diabetic polyneuropathy meets listing 11.04B, which requires:

> Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station.  (see 11.00C).

> 11.00C: Persistent disorganization of motor function.  In the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment.  The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

20 C.F.R. Pt. 404, Subpt. P, App. I, 11.00.

Although the ALJ does not specifically refer to listing 11.04B, this Court notes that a heightened articulation standard is not required at step three, and remand may not be required where the ALJ makes sufficiently clear the reasons for his listing determination so that the court can conduct a meaningful review.  *Marok v. Astrue*, No. 5:08-CV-1832, 2010 WL 2294056, *3 (N.D. Ohio June 3, 2010) (*citing Bledsoe v. Barnhart*, No. 04-4531, 2006 WL 229795, *411 (6th Cir. Jan. 31, 2006) (*citing Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1986)*)*).  At step three, the ALJ stated she considered Listing 9.08A, and specifically found that "claimant does not have significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements.)  (Tr. 87).  Although, admittedly, the ALJ could have explained more specifically her reasons for her findings at step three, courts have consistently held remand is not necessary where an ALJ's RFC analysis at the next step provides a detailed and thorough discussion of the evidence of record that sufficiently supports her listing determination.  *See Grohoske v. Comm'r of Soc. Sec.*, 2012 WL 2931400, *3, n.53

(N.D. Ohio July 18, 2012) (failure to articulate specific findings at step three may be harmless error not requiring remand where the step four analysis provides sufficient evidence of a claimant's impairments "in light of the listing as to permit a court to conclude from other parts of the ALJ's opinion that the listings were not met.").  Here, however, as described more thoroughly above, the ALJ did not adequately assess the evidence presented in her RFC analysis, specifically misinterpreting and failing to acknowledged evidence that could support Plaintiff's assertion that her condition is more limiting than as provided for by the RFC.  Accordingly, the ALJ's findings at step four are insufficient and cannot overcome the ALJ's meager and unsupported finding that Plaintiff does not meet or medically equal any of the listings.  *See Grohoske*, 2012 WL 2931400 at *3, n.53.  Therefore, on remand the ALJ is instructed fully consider the evidence of record in relation to the applicable listings, and specifically articulate her findings.

### C.  **Past Relevant Work**

The government concedes Plaintiff's argument that the ALJ's characterization of Plaintiff's former work as a telemarketer as "past relevant work" was erroneous because it fell outside the 15-year limitation period.  *See* 20 C.F.R. 404.1565(a); SSR 82-62 (15-year period runs from the date that a claimant's insured status expired).  However, on remand, the ALJ may appropriately consider other past relevant work as determined by a thorough and appropriate review of the evidence of record.

### VII. DECISION

For the foregoing reasons, the magistrate Judge finds that the decision of the Commissioner is not supported by substantial evidence.  Accordingly, the Court VACATES the Commissioner's decision and REMANDS the case back to the Social Security Administration.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  August 10,  2016.